ATLANTIC CITY AERIE NO. 64, FRATERNAL ORDER OF
EAGLES, PLAINTIFF, DEFENDANT IN ERROR, v. INTER-
NATIONAL FIDELITY INSURANCE COMPANY, DEFEND-
ANT, PLAINTIFF IN ERROR.

Argued March 11, 1912—Decided November 18, 1912.

A bond insuring a fraternal order against the dishonesty of its treas-
urer required insured's auditing committee, as conditions precedent
to the right of the obligee to recover thereunder, once quarterly
to make a full and complete examination of the treasurer's books
and accounts, and verify the bank balance by comparison of the
cash on hand with the check book and bank book. It also re-
quired all money coming into his custody to be deposited imme-
diately on the next succceeding business day in a bank. It fur-
ther required insured to give notice of anything of which it had
knowledge likely to cause a claim on or loss to the insurer, or of
any dishonest act or default of its treasurer. *Held*, that the "cash
on hand" which the auditing committee was required to verify
was the cash on deposit in the bank as shown by the books of
the bank, and where the committee merely examined the treas-
urer's bank book and check book without making any inquiry at
the bank, and thus failed to discover a defalcation, the insurer
was not liable.

On error to the Supreme Court.

For the plaintiff in error, *Garrison & Voorhees* and *De
Witt Van Buskirk.*

For the defendant in error, *Bourgeois & Coulomb.*

The opinion of the court was delivered by

KALISCH, J.    The errors assigned by the plaintiff in error
for a reversal of the judgment under review are five in num-
ber, but only one of them requires consideration by the court
and that one relates to the refusal of the trial judge to direct
a verdict for it, the defendant below.

The plaintiff below, a fraternal order, brought an action
against the Fidelity Insurance Company, the defendant below,
on a bond given by the insurance company to it, to indemnify

it, the plaintiff, from any loss it might sustain, by reason of the dishonesty of its treasurer, James B. Adams. Adams subsequently embezzled $943.52 from the order, and June 28th, 1910, the order notified the insurance company of its treasurer's shortage.

The bond recites: "This bond is issued by the surety and accepted by the obligee subject to the following express conditions, which shall be conditions precedent to the right of the obligee to recover hereunder." The twelfth provision of the bond provided: "The auditing committee of the obligee shall consist of other than any of the officials named herein and shall, as often as the constitution and by-laws of the obligee require, but at least once quarterly make a full and complete examination of the books and accounts of the officials, and verify the bank balance, by comparison of the cash on hand with the check book and bank book."

The evidence shows that Adams assumed the office of treasurer January 19th, 1909. At that time there was standing to the plaintiff's credit, in the Atlantic City National Bank, as shown by its ledger, $489.60. The plaintiff appointed an auditing committee to audit the treasurer's account February 23d, 1909, which was a quarterly audit, required by provision 12 of the bond, and covered the month of December, 1908, and the months of January and February, 1909. This committee reported the result of its labor, March 23d, 1909, to the plaintiff, to the effect that after a full inspection of the books it found the balance stated therein to be correct.

The evidence further showed that January 26th, there was turned over to the treasurer $176.85; February 2d, $205.95; February 9th, $240.55; February 16th, $69.15, and February 23d, $77.65.

The bank's ledger showed that there were no records of any deposits of $240.55, received by the plaintiff's treasurer February 9th, nor of $69.15, received by him February 16th, nor of $77.65, received by him February 23d.

The ledger further showed that March 1st, 1909, the plaintiff's balance, in bank, was $473.96, whereas from the testimony of Mr. Gillison, one of the plaintiff's auditors, it appears that

the treasurer ought to have had at that time, according to the books inspected by them, a balance to the plaintiff's credit of $883.21.

It is evident from this testimony that Adams was a defaulter before March 1st, 1909, to the extent of $409.25.

It is also self evident that if the auditing committee had complied with the twelfth provision of the bond, the defalcation would have been discovered and the further peculations which took place by its treasurer prevented. It was the duty of the plaintiff under the third provision of the bond to give immediate notice of anything of which the obligees have knowledge, likely to cause a claim on or loss to the surety or of any dishonest act or default of any official. Compliance with provision 12 of the bond and prompt action by the plaintiff in notifying the surety would have enabled it to take such immediate legal steps which might have resulted in its obtaining a re-imbursement for its loss. And besides it was a duty resting on the obligee according to the seventh provision of the bond to render every assistance, not pecuniary, capable of being rendered to bring the defaulting official to justice and enable the surety to be re-imbursed for such loss as it shall have sustained.

The essential requirements of provision 12 of the bond are—*first,* the auditing committee shall at least once quarterly make a full and complete examination of the books and accounts of the officials; *second,* it shall make this full and complete examination, by verifying the bank balance, by comparison of the cash on hand with the check book and bank book.

The evidence shows that the auditing committee complied with the first essential requirement, but it disregarded the second and most essential requisite, by failing to verify the bank balance, by comparison of the cash on hand with the check book and bank book. The treasurer is not supposed to have any cash on hand. The cash on hand refers to the cash on hand as appears by the books in the bank. This is made clear by provision 13 of the bond, which requires that all moneys coming into the custody of the treasurer shall im-

mediately and on the next succeeding business day be deposited by him in the bank in the name of the obligee. Therefore it is apparent that the only place where the auditing committee could have ascertained the actual amount of cash on hand was at the bank. And this is the one of the safeguards against dishonest accounts that is within the contemplation of provision 12.

It is a verification by a comparison of the cash on hand, as shown by the bank balance in the books of the bank, and the accurate amount of which must of necessity be ascertained from the bank, an independent and reliable source, and by comparing such balance with the check book and bank book in the possession and under the control of the treasurer.

If this be not so then the required verification is no verification at all but simply an idle and useless ceremony, so far as the surety is concerned.

It was never intended that the verification should consist only of a comparison of the account of the books of the order, more or less under the control of its officials, and the correctness of whose accounts is under investigation. The evidence clearly demonstrates that by reason of the fact that the auditing committee failed to make the verification as required by provision 12, of the bond, in making its quarterly audit ending March 1st, it failed to detect the embezzlements made by its treasurer, amounting to more than $400, which resulted in the retention of a dishonest official in a position of trust, who, it appears, continued to embezzle the plaintiff's moneys until the total of his defalcations at the time he fled from justice pending the quarterly auditing of his account for the quarter ending June 1st, amounted to $943.52, the amount sued for by the plaintiffs and for which it had judgment with interest.

The testimony shows that the bank book was taken away by the treasurer in his flight, so that it could not be ascertained whether the entries of the deposits evidenced thereby were really made by the bank or were forgeries.

The defendant company had a right to rely upon the performance, by the plaintiff, of its contract with it. It had a

right to place full reliance on a strict and faithful compliance by the plaintiff with the provisions of the bond. There was no duty, arising out of the contract, resting on the surety to inquire into or inspect the manner in which the auditing committee appointed by the plaintiff performed its task. It had a right to rely upon the presumption that the plaintiff was fulfilling the obligations imposed upon it by the bond. Therefore when the auditing committee failed to discover the embezzlements by the treasurer before March 1st, 1909, it was due to its failure to comply with provision 12 of the bond in not making the verification required by that provision. The verification required by that provision, as has already been stated, would have discovered the treasurer to be a defaulter. The failure to make the discovery was due to a breach of that provision. Since, it appears that the defalcations could have been discovered if provision 12 had been complied with by the plaintiff, and that as a result from its own act they were not unveiled, it follows as a fair and just conclusion that the defendant should not be held to suffer for the plaintiff's failure to give immediate notice of the defalcations to the defendant company, March 1st, when the audit was completed. The plaintiff should not be permitted to defeat the provision of the bond requiring notice where the dishonesty of the official bonded is detected, upon the plea that it had no knowledge of such dishonesty, when it appears that such want of knowledge was the result of its failure to comply with some other provisions of the bond which would have imparted such knowledge. These provisions were intended for the security of the obligor and it had the right to require a strict observance of and compliance with them. The provisions of the bond are made by the contracting parties conditions precedent to the right of the obligee to recover thereon. The plaintiff was obligated to show a performance of these provisions. This it did not do. Its failure to make the proper audit is the basis of the violations by it of the other provisions referred to.

For these reasons the judgment of the Circuit Court will be reversed.

WHITE, J. (dissenting). This case hinges upon the meaning of the word "verify" as used in article 12 of the bond. "Verify," in its broad and unrestricted sense, means "to prove to be true or correct." If this was the meaning intended in this instance there should have been no direction as to how this "verification" was to be accomplished, but the auditing committee should have been left to pursue its own methods of verification, inasmuch as its association was to be concluded by the result thereof. Article 12, however, does not leave the method of verification to the discretion of the auditing committee, but, on the contrary, prescribes what the auditing committee shall do by way of verification. In doing this it is obvious that the meaning of the word "verify" is limited, so that all the assured association is to be held answerable for is the verification of the accounts of the insured-against officer in the manner prescribed by the language used, and not to a verification in the sense of a guarantee by the association that the auditing committee shall discover any error or irregularity in such accounts if there be any. In other words, as I interpret the clause in question, the use of the word "verify" cannot be taken to enlarge the scope of the method of verification prescribed, but on the contrary, the method prescribed must be taken as limiting, to the scope of such method, the sense in which the word "verify" is used.

What then is the proper interpretation of the language, used in article 12, prescribing the method to be pursued by the auditing committee in its verification? This language is to be construed strictly against the defendant insurance company. That company is a corporation conducting a business of insuring for hire against loss by reason of dishonesty, amounting to larceny or embezzlement; its contracts are upon printed forms prepared in language of its own selection; it is the obligor under these contracts; and, in the present case, the clause of the contract under which defence is made, not only is drawn in the form of a condition precedent, working, and here claimed to work, a for-

feiture, but is in derogation to the purpose of the obligation. For each one of these reasons the clause must be strictly construed against the obligor.

Article 13 of the bond requires the treasurer to deposit all funds coming into his hands in the company's account in bank, and article 12 prescribes a method for the auditing committee to pursue in ascertaining whether or not his account of the funds so deposited is correct. The ordinary and practically universal method pursued by people who have bank accounts in verifying their accounts of their bank balances is to have their bank book balanced by the bank officials and returned to them with their canceled checks which have by that time been presented to the bank and paid; these checks are then checked off on the stubs of the check book and it is thus ascertained what checks are outstanding, and the sum of these outstanding checks is then added to the bank balance as shown by the depositor's own account, and if the sum thus ascertained corresponds with the bank balance shown by the settlement of the bank book by the bank officials, it is a verification of the depositor's account of his balance in bank. A careful reading of the language of article 12 does not disclose to me a direction for the auditing committee to follow any different course. The language is that the auditing committee shall "make a full and complete examination of the books and accounts of the officers, verifying bank balances by comparison of the cash on hand with the check book and the bank book." As I read this clause, the words "verifying bank balances" clearly refer to the bank balances shown by the "books and accounts of the officials" (in this case the treasurer) being audited, and it then says that this verification shall be by a comparison of the cash on hand, namely, the cash shown to be on hand by the treasurer's accounts as being in bank (because all of the cash had to be in the bank balance under article 13), "with the check book and the bank book." It seems to me that the clause standing alone is only susceptible of this interpretation, but if there was any doubt about it, I consider that doubt dispelled by the language of the printed

application for the bond, which, by the terms of the bond, is expressly made a part thereof and "the basis of the bond." This application makes the applicant undertake to have the books of account of the official insured against examined by the auditing committee at least once quarterly, and provides "the examination will include an actual count of the cash on hand, a verification of the *bank balance as shown by the bank book* and the bank balance as shown by the check book and the cash on hand." This provision in the application, relating as it does to exactly the same subject covered by article 12 of the bond, and expressly made the "basis upon which the bond is issued," must clearly be read in connection with article 12, and, if it requires any explanation, as explaining the language of that clause to refer to the *"bank balance as shown by the bank book."*

I think, therefore, that the clause 12 in question prescribes for the auditing committee exactly the course which was pursued by it in this case; that such course is the practically universal way in use by people having bank accounts, in keeping and verifying their own accounts of their moneys in bank; and that there is an entire failure in the clause in question to definitely prescribe or direct any other method than the one thus ordinarily pursued.

It is said that the concrete method of verification expressly provided for does not in fact verify; if this be granted, it does not alter the rules for the construction of contracts or relieve the party who drew the contract in his own favor from its strict construction.

Further than that, to hold that by reason of the use of the word "verify" the auditing committee was bound to proceed to an absolute verification, irrespective of any method pointed out or prescribed in express language in the same sentence, would of course necessitate an auditing of the accounts of the bank to guard against mistakes there as well as of the books of the official insured against. A sufficient answer to this proposition, aside from its absurdity, is that if that were intended, the defendant company which drew this bond, was bound to say so. If some intermediate

course was meant by the use of the word "verification," the question naturally arises, who is the one to decide what that intermediate course is. The bond itself is silent upon this point. If, as contended by the defendant, this modified form of verification should include only a visit by the auditing committee to the bank and on inquiry to the president, the cashier, one of the clerks, the porter, or some other person equally without authority to give any verbal statement on the subject, as to what the books of the bank show the balance to be at that time, this method is open to at least three objections: In the first place, the verbal communication thus received is difficult of certain proof; *second,* it does not offer a means by which the auditing committee can verify the accounts of the official insured against, because as it affords no information as to which outstanding checks have been presented and cashed by the bank and which are still outstanding, the auditing committee has no basis upon which to make its calculations; and *third,* if this method were adopted, it would still leave the defendant company free to claim, with equal, or as I think greater, reason that it was not the method that the auditing committee should have adopted in order to make an adequate "verification."

For these reasons I think the trial judge committed no error in leaving the question to the jury as to whether or not there had been an examination of the accounts of the defaulting official by the auditing committee in the manner prescribed by the terms of the bond—those terms being explained to the jury in accordance with the foregoing views, and there being conflicting evidence as to whether or not such audit was really made.

I think also that a company which issues a contract upon forms prepared by itself for the purpose of accomplishing a certain general purpose for which it is paid, should be required to state any exception in derogation of the purpose of that contract in such clear and unequivocal form that there can be no honest mistake as to its meaning. That the clause under consideration fails to comply with this suggestion is apparent from the fact that the auditing committee

(which was misled by it), the trial judge in the court below, and a minority of this court has taken a different view of its meaning from that entertained by the majority of this court. A clause which is even more offensive from this standpoint in that it means nothing or almost anything accordingly as a court may not or may interpret something into it which it does not contain, and which only fails to be involved in this case because it has not been invoked, is article 13 of this bond, which provides that it shall be a condition precedent, involving, of course, a forfeiture of any right of recovery, that the officer insured against shall deposit the moneys of the lodge coming into his hands from the collecting officials at each meeting, in the bank of the company (where it can only be drawn out by the signature of two officials) on the next succeeding business day after the meeting. In other words, the bond says that in consideration of the premium paid the insurance company will insure the plaintiff against loss from embezzlement of its funds by its treasurer, but that if the treasurer shall embezzle the funds during the only time when it is within his power so to do (which is just what this treasurer did), namely, while he has them in his possession before he deposits them, the insurance will become void. It would seem that a company which (putting it most favorably) by its apparently careless or ignorant use of legal terms comes so near issuing a fraudulent contract, should in its own interest not have its alleged "conditions precedent" taken too seriously.

I am requested by Justices Garrison, Bergen, Voorhees and Minturn and Judge Bogert to say that they concur in the views herein expressed.

*For affirmance*—GARRISON, BERGEN, VOORHEES, MINTURN, BOGERT, WHITE, JJ.    6.

*For reversal*—THE CHIEF JUSTICE, SWAYZE, TRENCHARD, KALISCH, VREDENBURGH, CONGDON, TREACY, JJ.    7.